LITTLEFIELD et al. v. CLAYTON BROS.
(No. 1110.)

(Court of Civil Appeals of Texas.    Amarillo.
March 14, 1917.)

1. SALES ☞413—ISSUE—SURPLUSAGE.
    In buyer's action to recover damages for failure to deliver calves pursuant to a sales contract, allegations that the seller's withholding of certain calves was fraudulent may be rejected as surplusage.
    [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1166–1169.]

2. TRIAL ☞296(12) — INSTRUCTIONS — MUTUAL MISTAKE.
    In buyer's action for damages, an instruction omitting the essential requirement of mutuality in defining mutual mistake is not reversible error where another portion of the charge covered the omission.
    [Ed. Note.—For other cases, see Trial, Cent. Dig. § 716.]

3. SALES ☞52(5) — BUYER'S ACTION FOR DAMAGES—SUFFICIENCY OF EVIDENCE.
    Evidence held to sustain a jury's finding that the enumeration of certain calves was omitted from a sales contract by mutual mistake, although one of the plaintiffs testified at one point that he was uncertain whether the agreement including them was made before or after the contract's execution.
    [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 136, 137, 139.]

4. SALES ☞36—MUTUAL MISTAKE — EFFECT OF NEGLIGENCE.
    Where a sales contract was dictated principally by defendant after several days' negotiations, plaintiffs' negligence in failing to discover a mutual mistake would not estop them from later seeking relief.
    [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 63, 64.]

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**5. DOMICILE ⊜═2 — "RESIDENCE" — INSTRUCTIONS.**

In a controversy over venue, an instruction defining "residence" as meaning living in a particular locality, although the intent to make it a permanent home be not present, is not incorrect especially when supplemented by appellant's requested instructions.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 2.

For other definitions, see Words and Phrases, First and Second Series, Residence.]

**6. DOMICILE ⊜═10—RESIDENCE—SUFFICIENCY OF EVIDENCE.**

Evidence that defendant spent a few days every ten days or two weeks at a ranch inside the state where he maintained a house which his family lived in for various periods sustains a verdict that such place was his residence, although he owned a home, sent his children to school, paid poll taxes, and voted outside the state.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 39.]

**7. DOMICILE ⊜═2 — RESIDENCE—DEFINITION.**

Although residence may not be acquired by temporary visits, a man may have several different residences.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 2.]

**8. SALES ⊜═179(4)—ACCEPTANCE OF GOODS—WAIVING DEFECTS.**

A buyer's acceptance of goods without protest constitutes an estoppel or waiver as to defects then known.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 460–463.]

**9. SALES ⊜═179(5) — ACCEPTING PART OF GOODS—WAIVING DELIVERY OF REMAINDER.**

A buyer's acceptance of part of the calves enumerated in a sales contract does not estop him from suing for nondelivery of the remainder.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 464.]

**10. SALES ⊜═3—DISTINGUISHED FROM ASSIGNMENT OF CONTRACT RIGHTS.**

Where the buyer after execution of a sales contract, but before delivery of the calves covered thereby, sold the calves to a third party upon understanding that he was to take the calves just as the buyer received them, there was a sale rather than an assignment of the contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 6–19.]

**11. SALES ⊜═418(1)—EXEMPLARY DAMAGES—BREACH OF CONTRACT.**

Exemplary damages may not be recovered for fraud in breaching a sales contract where the fraud inflicts no additional injury.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1174, 1201.]

**12. SALES ⊜═418(1)—BUYER'S ACTION FOR NONDELIVERY—MEASURE OF DAMAGES.**

Ordinarily the measure of damages for failure in whole or in part to deliver personal property pursuant to sales contract is the difference between the contract price and market value of the undelivered property.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1174, 1201.]

**13. SALES ⊜═418(1)—BUYER'S ACTION FOR NONDELIVERY—MEASURE OF DAMAGES.**

The measure of damages for failure to deliver certain calves pursuant to a sales contract is the difference between the contract price and market value of the undelivered calves instead of the difference between the market value of the calves contracted for and calves delivered less the contract price of the undelivered calves, where there is evidence that the nondelivery depreciated the value of the remainder of the herd.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1174, 1201.]

**14. SALES ⊜═418(10)—BUYER'S ACTION FOR NONDELIVERY—SPECIAL DAMAGES.**

In buyer's action for nondelivery of certain cattle, damages caused rest of the herd by such nondelivery must be specially pleaded and proved.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1191.]

**15. SALES ⊜═416(2)—BUYER'S ACTION FOR NONDELIVERY—SPECIAL DAMAGES.**

Testimony that smaller bids would be made for a herd of cattle from which the best calves had been removed and that presence of such calves would enhance the value of the whole herd *held* insufficient to sustain a verdict for special damages for such depreciation to rest of the herd.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1172.]

**16. APPEAL AND ERROR ⊜═1171(1)—REVIEW —INCORRECT MEASURE OF DAMAGES.**

Where a case is submitted on an incorrect measure of damages, and the appellate court cannot determine what might have been the result if correctly submitted, it will be reversed, although the verdict might be sustained by the evidence if a correct measure had been adopted.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4546, 4552.]

**17. APPEAL AND ERROR ⊜═934(1)—PLEA OF PRIVILEGE—WHEN CONSIDERED OVERRULED.**

Where a verdict found defendant's residence in accordance with plaintiffs' claim, and the court entered judgment for plaintiffs without mentioning the plea of privilege, the Court of Civil Appeals will regard the action as overruling the plea.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3777, 3780, 3781.]

Appeal from District Court, Lubbock County; W. R. Spencer, Judge.

Suit by Clayton Bros. against George W. Littlefield and another. Judgment for plaintiffs, and defendants appeal. Affirmed in part, and reversed and remanded in part.

Martin, Kinder, Russell & Zimmermann, of Plainview, and W. H. Bledsoe, of Lubbock, for appellants. Bean & Klett and W. F. Schenck, all of Lubbock, and Gilliland & Estes, of Hereford, for appellees.

BOYCE, J. This suit was brought by appellees, Clayton Bros., against appellants, Geo. W. Littlefield and J. P. White, in the district court of Lubbock county, Tex., to recover damages for breach of contract for sale of cattle. It was alleged that the plaintiffs contracted with defendants for the purchase of all calves born on certain ranches of the defendants during the year 1915 up to Sep-

tember 15th, and also the unbranded calves of 1914; that a written contract was entered into, but by mutual mistake the agreement to include the unbranded calves of 1914 on said ranches was omitted from the written contract, and by its terms only the calves born during the year 1915 were included. Plaintiffs further alleged that there were about 6,000 head of calves that should have been delivered under the terms of the contract, but that the defendants in fact delivered only 5,032 head, and that the defendants fraudulently concealed and refused to deliver a large number of the best of the calves, delivering only the "tailings" to the plaintiffs, and sought to recover $40,000 actual damages and also the sum of $40,000 exemplary damages. The defendants pleaded to the venue, as hereinafter more fully stated, and answered by general and special denials of the allegations of plaintiffs' petition.

The jury having found that the provision for the sale of the unbranded 1914 calves was omitted by mutual mistake from the written contract, that the defendants failed to deliver some of the calves to which plaintiffs were entitled under their contract, and that plaintiffs were damaged thereby in the sum of $2,323, judgment was entered for the plaintiffs for that amount, from which judgment this appeal is taken.

Giving the verdict of the jury the effect to which it is entitled, as resolving the conflicts in the evidence, we find that the evidence establishes the following facts: The plaintiffs and the defendants, on the 12th day of July, 1915, entered into a contract in writing whereby the defendants agreed to sell to the plaintiffs all of the calves, with certain stated exceptions, and a specified cutback, the drop of 1915, up to September, 1915, on the Yellow House ranch, in Texas, and Four Lakes ranch, in New Mexico, owned by the defendants. Delivery of the cattle was to be begun on October 20, 1915, and continued as rapidly as the cattle could be rounded up and deliveries made. The consideration to be paid for said calves was the sum of $30 per head for all calves delivered, $20,000 being paid in cash on execution of the contract, and the balance to be paid as the cattle were delivered under the contract. In the negotiations preceding the preparation of the written contract it was understood that the unbranded calves of the year 1914 on the said ranches, such calves being known as long age or winter calves, should also be included at said price of $30 per head, but by the mistake of the parties this agreement was omitted from the written contract. The defendants delivered under this contract 1,466 calves from the Four Lakes ranch and 3,566 calves from the Yellow House ranch, for which the plaintiffs paid the agreed price of $30 per head. The defendants, without fraud, acting under their interpretation of the contract as not covering 1914 calves, did not deliver some of the long age calves to which plaintiffs were entitled under the contract; the evidence suggesting that this number might be anywhere from 50 to 300 head. These calves, being older, were larger and for that reason worth more than the other calves, most of which were born during the spring and summer months, and plaintiffs sustained some damages by reason of the failure to deliver such calves. We will make such further statement of the pleadings and evidence as we deem necessary in connection with our consideration of the several assignments.

[1] Plaintiffs in their petition had alleged that the defendants were guilty of fraud in concealing and not delivering the larger calves, and the jury found in answer to one of the special issues submitted that the defendants did not practice fraud in this respect. The appellants by their first assignment, assert that, since the jury found against the plaintiffs on this issue, judgment should have been rendered for appellants on the verdict of the jury. The gist of plaintiffs' cause of action, as shown by the petition, is for breach of the contract in failing to deliver some of the calves. It was therefore unnecessary for the plaintiffs to allege or prove that the failure to deliver under the contract was fraudulent, and the allegations of fraud and the finding of the jury thereon may be disregarded as surplusage, in so far as the right to recover on account of the breach of the contract is concerned.

It appears from the evidence that the plaintiffs made no complaint as to the delivery of the Four Lakes calves, and also that soon after the execution of the contract sued upon the plaintiffs had contracted to sell all the steer calves, to be delivered under the contract to one Elwood, who was to accept delivery, and who did accept delivery thereof, as the calves were delivered under the contract between plaintiffs and defendants. Appellants by their second and third assignments complain of the action of the jury in finding the amount of the damages sustained and the court's refusal to give a peremptory instruction, because, as they allege, there was no evidence to show what effect the topping had on the Yellow House heifers alone, they being the only calves which under the evidence were shown to have been topped, if at all, to plaintiffs' damage, and hence there was no basis for estimating any damages. The testimony offered by the plaintiffs gives estimates on the damage to a herd of 5,000 head of calves, resulting from taking out various numbers of the best calves, ranging from 25 head up to 250, so that, if the measure of damages as submitted was correct, which matter we will discuss hereafter, the jury did have a basis in the evidence from which to estimate the damages, and these assignments are not well taken.

The fourth assignment complains of the

charge of the court which limits the consideration of certain testimony offered for the purpose of impeachment as being on the weight of the evidence, by reason of the wording of the charge. While the charge might have been worded so as to avoid some of the objections raised to it, we do not think it reasonably appears that it was calculated to lead the jury to give any undue weight to the testimony referred to. State v. Hilsabeck, 132 Mo. 348, 34 S. W. 38.

[2] The court's definition of mutual mistake in the main charge might be misleading for the reason that it omitted the essential requirement of mutuality. The special charge requested by appellants and given by the court fully covered this omission, however, and the two charges, taken together, are not inconsistent, and we do not think the jury could have misunderstood the charge, and for this reason overrule appellant's fifth assignment.

[3] The sixth assignment asserts that the finding of the jury that the provision for the sale of the 1914 unbranded calves was omitted from the contract by mutual mistake is not supported by the evidence. In their statement under this assignment appellants quote certain testimony of one of the plaintiffs to the effect that he could not say whether the agreement to include the 1914 unbranded calves in the sale was made before or after signing the contract. This testimony, considered alone, would support this assignment. However, a reading of the entire testimony of the witness, as well as the testimony of the other witness offered by the plaintiff on the subject, discloses that, according to the testimony of such witnesses, the subject of the unbranded long age or winter calves was discussed with the defendant White several times while the negotiations for the sale were proceeding, and White stated on these occasions that these calves were to go in the sale, and that he would instruct his men to do no more branding of such calves, and the contract was closed with this understanding. This witness testified that he discovered the omission within a few minutes after the contract was prepared and as they were preparing to leave the place where the contract was written, and called the defendant White's attention to the fact, when he again made the statement that it was understood that all unbranded calves should be delivered under the contract. The reading of this detached part of the witness' testimony does not furnish a fair conception of his testimony taken as a whole. We think the evidence is sufficient to support the finding of the jury on this issue.

[4] In this connection we will consider appellants' twelfth assignment, which complains of the failure of the court to submit the issue of negligence on the part of the plaintiffs, with reference to the failure to have the provision for the unbranded calves of 1914 included in the contract. The evidence shows that the contract was drawn after protracted negotiations, extending over a period of several days; that the plaintiffs and the defendants were together before the scrivener when the contract was being dictated. It was dictated by the defendant White principally, though the others made suggestions from time to time. If the mistake was mutual, we do not think that negligence or inattention on the part of the plaintiffs under the circumstances would preclude them from asking for relief on account of the mistake. San Antonio National Bank v. McLane, 96 Tex. 48, 70 S. W. 203; Kelley v. Ward, 94 Tex. 289, 60 S. W. 311.

The defendant Geo. W. Littlefield resided in Travis county, Tex., and the plaintiffs sought to sustain in the venue in Lubbock county by reason of the fact of the alleged residence of the defendant J. P. White, in Hockley county, an unorganized county, attached to Lubbock county for judicial purposes, and on account of the further allegations of fraud in connection with the breach of the contract, which was alleged to have been perpetrated in Hockley county. The defendants denied that the defendant White resided in Hockley county, alleged his residence to be in Roswell, N. M., and alleged that the allegations of fraud were fraudulently made for the purpose of maintaining jurisdiction. The question of the residence of the said White was submitted to the jury, and in response to a special issue it was found by the jury that White did reside in Hockley county.

[5] The appellants by their seventh assignment assign error on the definition of "residence," as given in the court's charge, and by their seventeenth assignment attack said finding of the jury as being unsupported by the evidence. The definition of "residence," as contained in the court's charge, was copied from the definition adopted by the Supreme Court in the case of P. & N. T. Ry. Co v. Thompson, 106 Tex. 456, 167 S. W. 801, and is not incorrect. If it is not sufficiently full, the deficiency was supplied by the special instruction elaborating the definition requested by the defendant, and given by the court. The question as to whether the findings of the jury on the issue of residence is supported by the evidence is more serious.

[6, 7] The only testimony offered on the issue was that of the defendant J. P. White, who testified that he was a married man and had lived at Roswell, N. M., since 1903, at which place he owned his home, sent his children to school, paid his poll taxes, and voted; that he was superintendent of the Yellow House ranch, in Texas, and the Four Lakes ranch, in New Mexico, both very large properties, owned jointly by himself, the estate of his deceased brother, and Geo. W. Littlefield; that he was frequently at the Yellow House ranch, "from one to three

days at a time, and that every ten days or two weeks"; that he was generally at the ranch the last two days of each month, but kept no trunk there, bringing with him a change of clothing in a hand grip; and that during the year 1916, the year in which the suit was instituted, he had been at the Yellow House ranch in all perhaps about 30 days. On first examination the said defendant testified:

That he had a residence at the Yellow House ranch, which consisted of a six-room house, and "when I am at the ranch I stay in the house referred to as a residence. When my family is there they cook for us, and when they are not there we eat with the men. When my family is there we stay in the house that I referred to as a residence and have our cooking done there, and when they are not there I sleep there and eat at the ranch house with the hands."

This residence was shown to be some little distance from the ranch houses occupied by the foreman and hands on the ranch, and it is not shown that it is regularly occupied by any one except the defendant White and his family. And on subsequent examination by appellants, the defendant White testified:

"I don't have there an exclusive room occupied by myself. I have no bed there, a special bed, only the company bed I occupy when I am in there, and when I am not there others occupy it; the door is open for them."

Ordinarily a man's residence and domicile are the same though this is not necessarily true. Residence carries with it the idea of an abode, a place of living or a home, and may not be acquired by mere temporary, casual, or even frequent visits, and presence at a place without such presence assumes the character embodied within the meaning of some of the foregoing terms. Our decisions recognize that a person may have several different residences. If a man have several different places at which he and his family establish themselves as in a home, and live during certain seasons of the year, he may acquire a residence at each of such places. Pearson v. West, 97 Tex. 238, 77 S. W. 944; G., C. & S. F. Ry. Co. v. Rogers, 37 Tex. Civ. App. 99, 82 S. W. 824; O'Connor v. Cook, 26 S. W. 1113; P. & N. T. Ry. Co. v. Thompson, 106 Tex. 456, 167 S. W. 801. The burden of proof was by the charge of the court placed on the defendants to establish the negative of the issue as to whether defendant J. P. White resided in Hockley county. The testimony, which we have referred to above, does not show how much of the time the family of the said White is at the ranch nor anything further as to the character of their visits and stay there, nor does this evidence make it clear that the residence is not reserved for the use of the said White and his family, and suggests a probability that the residence at the Yellow House ranch might be occupied by the said defendant's family for considerable portions of the year, and does not repel the suggestion that it might be so occupied as to constitute one of the residences of the family. So that we do not feel at liberty to disturb the finding of the jury on this issue.

In view of this holding we do not authoritatively decide as to whether the jurisdiction may be sustained by reason of the allegations of fraud, though we may say that we are of the opinion that, as we more fully point out elsewhere, the allegations of fraud add nothing to the rights of the plaintiff, so that fraud is not such basis of the suit as would bring it within the meaning of the statute fixing venue in such cases. Baines v. Mensing, 75 Tex. 200, 12 S. W. 984; Oakes & Witt v. Thompson, 58 Tex. Civ. App. 364, 125 S. W. 320; Cloyd v. Sacra, 175 S. W. 456; Seley v. Whitfield, 46 S. W. 865. Besides, the jury found that there was no fraud, and there is a line of decisions that holds that in such cases the plea of privilege should be sustained, notwithstanding there was no evidence to establish that the allegations of fraud were fraudulently made for the purpose of conferring jurisdiction. Hilliard v. Wilson, 76 Tex. 180, 13 S. W. 25; Cannel Coal Co. v. Luna, 144 S. W. 723; Cloyd v. Sacra, supra. We do not undertake to determine whether these decisions may be distinguished from those cases that decide that, where a joint liability is alleged, and jurisdiction acquired by reason of the presence of one of the defendants, who is ultimately held to be not liable jointly, it is nevertheless incumbent on the other defendant, resident of another county, to establish that the allegations of joint liability were fraudulently made, before he is entitled to have his plea of privilege sustained. Wichita Falls Compress Co. v. Moody, 154 S. W. 1032; Railway Co. v. Williams, 38 Tex. Civ. App. 405, 86 S. W. 38; Railway Co. v. Stell, 61 S. W. 980. If the two lines of authorities may not be reconciled, we would feel constrained to follow the decision of Hilliard v. Wilson, supra, as that decision was by the Commission of Appeals, and approved by the Supreme Court, and has subsequently been referred to with approval by the Supreme Court.

We do not think it is at all likely that the jury could have taken the language used in the submission of the issue as to the amount of damages as an expression of opinion on the part of the court as to any fact in issue before the jury, and overrule the eighth assignment.

[8, 9] The ninth assignment complains of the refusal of the court to submit an issue as to whether plaintiffs discovered prior to the performance of the contract that some of the calves were being held back. The calves were delivered in several different bunches as they were gathered. There had been some wrangling on one occasion as to certain calves which defendant White was proposing to hold, but which were delivered on plaintiffs' insistence, and later, but prior to the completion of the delivery, one of the plain-

tiffs saw some big calves in another pasture, which had been branded in defendants' brand, and withheld from delivery. He said nothing to the defendant White about this at the time, but at the time of final delivery and settlement states that he charged the defendant White with having held back some of the calves and White denied having done this. When goods are accepted without protest, with knowledge of defects, as being in fulfillment of the terms of the contract, the acceptance will constitute an estoppel or waiver, but we do not think the facts stated bring this case within this rule. The plaintiffs were entitled, under their contract, not only to the calves which were actually delivered, but to the others, and the mere acceptance of a delivery of the part, without some act evidencing their intention not to insist on the contract as to the others, would not constitute a waiver or estoppel.

[10] We do not think there was error in refusing to submit the issue requested by appellants as to whether there had been a partial assignment of the contract to Elwood. The testimony is to the effect that some time after the execution of the contract and before delivery of the calves the plaintiffs sold to Elwood the steer calves to be delivered under the contract with defendants at $32 per head. Plaintiffs, after having testified that they sold the steers to Elwood, stated:

"He (referring to Elwood) was to take our contract on the steer end of the calves. He was to receive them just as I received them at the Yellow House pens, according to that contract."

We think the evidence shows a sale of the calves rather than a partial assignment of the contract between plaintiffs and defendants; said contract between plaintiffs and defendants merely supplying the description of the calves and the stipulation as to time, manner, and place of delivery in the contract of sale from the plaintiffs to Elwood.

[11] We are of the opinion that the exception to that part of the pleading seeking recovery for exemplary damages should have been sustained. The plaintiff's right which was violated was to have delivery made of certain calves, and the wrong done him was the failure to deliver the calves. Plaintiff's right was secured by the contract, and the wrong was in the breach of it. The motives that may have impelled the defendants to withhold some of the calves did not add to plaintiff's actual damages. So that the real and only foundation for the recovery of actual damages is in the breach of the contract. If the fraudulent act of the defendants perpetrated in connection with the breach of the contract, had inflicted some other and different injury upon the plaintiff from that which would have been suffered from the breach of the contract in the absence of the fraud, plaintiffs would undoubtedly have had the right to join the action for tort with the action for breach of contract, and under proper showing recover exemplary damages; but, as we understand our decisions, where the fraud in breach of the contract inflicts no other or additional injury, exemplary damages may not be recovered. H. & T. C. Ry. Co. v. Shirley, 54 Tex. 147; Shirley v. Waco Tap Railway Co., 78 Tex. 131, 10 S. W. 543; McCauley v. Long & Co., 61 Tex. 77; Hooks v. Fitzenrieten, 76 Tex. 277, 13 S. W. 230. As the jury did not find exemplary damages, this error would not require a reversal of the case, but, as the case is to be reversed on another assignment, we rule on this question so that it may be eliminated upon another trial.

[12, 13] The thirteenth, fourteenth, fifteenth, and sixteenth assignments, as to the giving and refusal of charges and the introduction of evidence, question the correctness of the theory of the measure of damages on which the case was tried. Ordinarily the measure of damages for the failure in whole or in part to deliver personal property under contract of purchase is the difference in the contract price and the market value of the undelivered property at the time and place provided for delivery by the contract.

The object of the law is to award compensation, and where one has been deprived of personal property to which he is entitled, whether the deprivation is the result of tort or the breach of a contract, this may be accomplished by awarding the injured party the market value of the property because he can make himself whole by supplying himself with the property from other sources, at its market value. If the party claiming the damages is a purchaser, he can recover no more than it would cost him, with reasonable diligence, to supply himself with the same property by resort to the market or other sources of supply. Sutherland on Damages (4th Ed.) § 89. If the property has no market value or cannot be obtained from other sources, then, of course, upon such fact being shown different elements of damage may be considered. Sutherland, § 52. For the same reason the same rule would apply where there has been a partial delivery of property under a contract, and it has been so held. Sutherland, §§ 645, 655; 35 Cyc. 639; Mechem on Sales, vol. 2, § 1377. Sutherland, at section 645, in reference to a partial delivery, says:

"If the vendee retains the part delivered, after the vendor has made default in respect to the residue, it is a severance of the contract, and the vendor is entitled to recover the contract price for what is so delivered and retained."

Mechem on Sales, vol. 2, § 1337, states the rule thus:

"If the default be as to delivery of part only, and the contract is severable, then damages as to that part could be recovered under the general rule already given (that is, the difference between the contract price and the market value of the undelivered property); if the contract were entire, but the part not delivered could be procured in the market, the general rule could also be applied; but where the contract is entire, and the missing part cannot be so procur-

ed, damages based upon the diminished value of the whole from the nondelivery of the part (that is, the difference between the value of the whole and the value of the part) would be recoverable."

If the contract here, from its very nature, was not severable, .it was made so by the ·plaintiff's accepting and retaining the cattle delivered after the knowledge of failure to deliver a part of the long age calves. Even if this is not correct, the ordinary rule of damages should· be applied here because there was no evidence that calves such as those that were not delivered could not have been purchased at their market value elsewhere. So we think that the measure of damages as announced in the above authorities is the measure that should have been applied in this case.

The theory of damages under which the case was tried is thus stated in the charge of the court:

"The difference between the market value of the calves contracted for and the market value of the calves delivered, less the contract price of the calves not delivered."

In many cases the result of such a rule would be the same as the rule announced above, but under this theory of damages evidence was introduced on the trial to the effect that the "topping," as it was called, of the calves, diminished the value of the remaining calves and of the entire herd out of all proportion to the· value of the top calves themselves. Long age calves, according to plaintiff's testimony, would be worth about $50 per head; but testimony was offered to the effect that the taking out of from 25 to 50 head of these calves would damage the herd of 5,000 calves in the sum of $10,000. Plaintiff testified:

"In my judgment, if you top 150 out of 5,000, you would have a $25,000 damage. I would say 300 to 400 topped would be a $50,000 damage."

Other testimony than that of the plaintiff was offered to the same effect, though the witnesses vary the damage to a herd of 5,000 calves by the taking out of 250 tops from $2 to $7 per head.

[14, 15] We take it that damages, in addition to the value of the cattle taken out, from the taking or withholding of only a part of a herd of cattle that would result to the balance of the herd, on account of the diminished value of the individual cattle remaining, would be special damages recoverable only on pleading and proof of the, special facts. If the presence of the larger cattle increased the value of the smaller ones more than the value of the larger cattle, such damages could be obviated by the purchase of other cattle at the market price to take their place, and the rule as to the measure of damages. we have announced would still apply. If for any reason the ordinary rule of damages cannot be applied, by reason of the fact that the larger cattle could not be replaced, plaintiff would be required to specially plead and

prove the facts. However, we are of the opinion that the evidence offered on the trial would not justify the recovery of the increased value of the smaller cattle, due to the presence of the larger cattle in the herd, even if special facts authorizing such recovery had been pleaded and proven. The reason given by the plaintiff as to the decrease in value on account of the larger cattle being taken out is thus stated by the plaintiff:

"It injured them in several different ways to take the top out of the herd of steers. Several different ways it damages a man's cattle. One is that, the fact being known that your cattle had been topped, you cannot get lots of men to look at them. Another is that a man buying them he would buy them with several dollars a head less than he would if he knew that the top cattle were there. If you wanted to put the cattle on the market, there would be a shortage on the weight of the entire herd on the market. * * * The more top you had the better they would sell. Every one of the big fine ones a man could see looking at them it would have a good effect on him, make him' think they were worth more money."

Whether plaintiff's herd would have acquired a reputation of having been topped and as to the effect this would have had on plaintiff's ability to get buyers to look at his cattle, and particularly as to the extent the presence of the big calves in the herd might affect the judgment of the buyer as to the others, and make him think they were better, are results and considerations so uncertain and speculative as that we do not think they can be safely made a basis on which to found a measure of damages. Fraser v. Echo Mining & Smelting Co., 9 Tex. Civ. App. 210, 28 S. W. 714, and authorities cited. The item of decrease in the weight of the herd is, of course, a certain and definite element of damage, but this item, we take it, would be fully compensated for in the ordinary measure of damage.

[16] While the verdict of the jury is not so large but that it might be sustained by the evidence, if the proper measure of damage had been applied, we must reverse the case for this error because it was tried on an incorrect theory of damage, and we are unable to determine what might have been the result if it had been tried on the correct measure.

.[17] We find no judgment in the record directly passing on the defendant's plea of privilege. Upon return of the verdict of the jury, in which the residence of J. P. White was found to be in Hockley county, the court entered judgment for the plaintiff without mentioning the plea of privilege. We will treat this as being in effect a judgment overruling the plea of privilege. If this is not its effect, the appellant would be held to have waived the plea of privilege, not having invoked the action of the court upon it at the first term of court. Treating the judgment, therefore, as being a judgment overruling the defendant's plea of privilege, and for the plaintiffs on the merits of the case, we will

affirm that part of the judgment which overrules the plea of privilege and reverse and remand the case for another trial on the merits.

HALL, J., not sitting.