**WILKINS et al. v. DAGLE et ux. (No. 1136.)**

(Court of Civil Appeals of Texas. Beaumont. Oct. 30, 1924.)

1. **Appeal and error ☞209(1), 294(1), 719(6) —Appellants held precluded from raising question as to sufficiency of evidence to support jury findings.**

Where appellants did not object to questions as submitted to jury, nor move to set aside jury's verdict thereon, and did not present on appeal assignments that answers are against weight of evidence, their proposition raising issue as to sufficiency of evidence to support jury findings could not be considered.

2. **Appeal and error ☞241—Request for instructed verdict held to raise issue as to nonexistence of evidence warranting submission of questions to jury.**

Request for instructed verdict *held* to raise issue as to nonexistence of evidence warranting submission of questions to jury.

3. **Reformation of instruments ☞46—Whether deed, conveying fee title to land instead of mineral rights therein, was executed under mutual mistake held for jury.**

Whether deed, conveying fee title to land instead of mineral rights therein, was executed under mutual mistake *held* for jury.

4. **Reformation of instruments ☞44—Evidence held admissible as bearing on issue.**

In action to reform deeds, evidence *held* not inadmissible as tending to prove a contract different from that pleaded as actually made and that evidenced by the deeds as they stood.

5. **Acknowledgment ☞62(3)—Reformation of instruments ☞44—Testimony of notary public that he did not explain deed to grantee held not impeachment of his certificate, where sufficiency of latter was not in issue; testimony of notary admissible on issue of mistake.**

In suit to reform deeds so as to convey mineral rights intended to be conveyed, rather than fee simple conveyed through mistake, testimony of notary public who took acknowledgment that he did not explain deed to grantor *held* not improperly received as impeaching his notarial certificate; sufficiency of latter not being in issue, but such testimony being admissible, although parol evidence to show mutual mistake in execution of instrument.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**6. Appeal and error ⊙⟶1067—Failure of court to define distinction between conveyance of "fee-simple estate" and of "royalty interest" held not prejudicial.**

Failure of court to define distinction between conveyance of "fee-simple estate" and of "royalty interest" *held* not prejudicial, in view of evidence under which jury must have understood distinction.

**7. Appeal and error ⊙⟶1170(9)—Under rule 62a of Courts of Civil Appeals, refusal to define distinction between conveyance of "fee-simple estate" and "royalty interest" held not reversible.**

Under rule 62a of Courts of Civil Appeals, a refusal to give a charge such as one defining distinction between conveyance of "fee-simple estate" and of "royalty interest" *held* not reversible error.

**8. Trial ⊙⟶194(2)—Requested charge as to presumption execution of deeds raises, and degree of proof to overcome presumption, held properly refused as being on weight of evidence.**

In suit to reform deeds intended to convey only mineral rights in land, but which through mistake conveyed fee simple, where effect of deeds as conveyances was admitted, refusal to give requested charge as to presumption as to parties' intention as to effect of deeds raised by execution of and delivery of deeds, and proof required to overcome such presumption, *held* properly refused as being on weight of evidence.

**9. Appeal and error ⊙⟶1170(9)—Refusal to charge as to presumption raised by execution and delivery of deeds, and degree of proof necessary to overcome presumption, held not reversible error.**

In suit to reform deeds intended to convey only mineral rights in land, but which through mistake conveyed fee simple, refusal to give requested charge as to presumption raised by execution and delivery of deeds, and degree of proof necessary to overcome such presumption, *held* not reversible error, in view of rule 62a of Courts of Civil Appeals.

**10. Reformation of instruments ⊙⟶25—Person to be entitled to reform instrument executed under mutual mistake need not show diligence in determining contents when executed.**

Person seeking to reform a deed or any other contract, on ground of mutual mistake, need not show exercise of diligence to determine what instrument contained when he executed it.

Appeal from District Court, Liberty County; J. M. Combs, Judge.

Suit by A. R. Dagle and wife against A. D. Wilkins and others. Judgment for plaintiffs, and defendants appeal. Affirmed.

J. Llewellyn, of Liberty, for appellants.
E. B. Pickett, Jr., of Liberty, for appellees.

WALKER, J. This suit was instituted by appellees to reform and correct two deeds executed by them to appellants, one dated in February, 1919, and the other dated in March, 1919, the second executed as a correction of the first, and both describing the land conveyed as "an undivided four and one-half acres interest of all that tract or parcel of land," etc., giving a detailed description of the land. The deeds conveyed the land in fee simple and by general warranty. Appellees give in their brief the following statement of the nature of their petition:

"The appellees A. R. Dagle and Serena Dagle, husband and wife, by their first amended original petition, pleaded that on February 15, 1919, and for a long time prior thereto, they owned in fee simple a certain nine-acre tract of land in the west half of the Jesse Devore league, and that they and their family had for 20 years and more 'actually occupied, used, and enjoyed said land and premises as their homestead, and without interruption or cessation have continued to do so.' That shortly before February 15, 1919, appellees negotiated with A. D. Wilkins, one of the appellants, relative to selling him 'all the oil, gas, and other minerals in, upon, and under an undivided four and one-half acres in and to said nine-acre tract of land in the Devore league above described, and plaintiffs and said defendant concluded an agreement whereby said defendant was to buy and plaintiffs were to sell him such oil, gas, and other minerals in, upon, and under the said undivided four and one-half acres in said nine-acre tract of land; and in pursuance of such agreement, and to complete same, plaintiffs did on the 15th day of February, 1919, execute a certain written instrument in which the defendant A. D. Wilkins is named as grantee, and which is of record in volume 78, page 330, Liberty County Deed Records, and in executing said document it was the intention of plaintiffs to sell and convey to said defendant only the oil, gas, and other minerals in, upon, and under the said undivided interest of four and one-half acres of land in said nine-acre tract, but the written instrument as signed purports to convey to said defendant A. D. Wilkins an undivided four and one-half acres in fee simple of the said nine-acre tract of land, which was contrary to the purpose and intention of the plaintiffs in making and executing said instrument, and the said instrument, so now of record, as aforesaid, was incorrectly drawn up as a deed in fee simple by mistake, and it did not and does not express the mutual intent of the parties thereto, but was signed and executed by plaintiffs and acknowledged by them and received by the said defendant under a mutual mistake of fact as to the effect and contents of the said written document.' It was further alleged by appellees that they 'agreed to sell and convey to said defendant Wilkins only all oil, gas, and other minerals in, upon, and under the undivided four and one-half acres in said nine-acre tract of land, and it was only such an interest in said land that the defendant had agreed to buy, and such interest only did he pay plaintiffs for, and the said written instrument should have been prepared and worded so as to convey to said Wilkins only that interest of the oil, gas, and other minerals in, upon, and under said land, and it was such a conveyance that plaintiffs in-

tended to execute and believed they were executing when they signed and acknowledged said written instrument of date February 15, 1919, and now of record in volume 78, page 330, Liberty County Deed Records,' and 'that after the execution of said written document, of date February 15, 1919, the defendant A. D. Wilkins requested of plaintiffs the execution of another document, representing that the same was needed to correct the habendum clause in the written document of date February 15, 1919, it being at this time represented to plaintiffs by said defendant that such one correction alone was necessary, and that otherwise the written document of date February 15, 1919, was worded so as to properly carry out the purpose and intention of the parties thereto, to wit, to convey to said Wilkins all oil, gas, and other minerals in, upon, and under an undivided interest of four and one-half acres in said nine-acre tract of land, and, believing that this second written instrument would make such a correction in the habendum clause only of the first document, the plaintiffs, executed another written instrument, of date March 21, 1919, and now of record in volume 85, page 368, Liberty County Deed Records, and this second written instrument is erroneous in the same respect as was the first instrument executed by plaintiffs, as above particularly alleged, and this incorrect wording and preparation of such second document was the result of the same mutual mistake or fraud on the part of the said defendant Wilkins as is above particularly alleged in reference to the first written instrument signed by plaintiffs of date February 15, 1919.' Appellees also pleaded in the alternative that the defendant Wilkins fraudulently procured the preparation and execution of said deed, but such issue of fraud was not raised by the evidence."

The defendants answered by general demurrer, general denial, and plea of innocent purchaser, and for partition of the land. The plea of innocent purchaser was not raised by the evidence.

The case was submitted to the jury on the following questions:

"Question No. 1. At the time of the execution and delivery of the deed in evidence before you, of date February 15, 1919, did the plaintiffs Mr. and Mrs. Dagle intend to sell and convey only the oil, gas, and other minerals in, upon, and under an undivided interest of four and one-half acres in the nine-acre tract of land described in plaintiff's petition?

"Question No. 2. At the time of the execution and delivery of the deed in evidence before you, of date February 15, 1919, did the defendant A. D. Wilkins intend to buy only the oil, gas, and other minerals in, upon, and under an undivided interest of four and one-half acres in the nine-acre tract of land described in plaintiffs' petition?

"Question No. 3. At the time of the execution and delivery of the deed in evidence before you, of date February 15, 1919, did the defendant A. D. Wilkins understand and intend to buy an undivided four and one-half acres in fee simple in the nine-acres of land described in plaintiffs' petition?

"Question No. 4. At the time of the execution and delivery of the deed dated February 15, 1919, did A. D. Palmer or A. R. Dagle understand that said deed conveyed the fee-simple title to the undivided interest of four and one-half acres in the nine-acre tract described in plaintiff's petition?"

The jury by its verdict answered "Yes" to said questions Nos 1 and 2, and answered "No" to questions Nos. 3 and 4.

[1] Appellants' assignment of error, and the first, second, and third propositions thereunder, are as follows:

Assignment of error: "The court erred in failing and refusing to charge the jury to return a verdict for the defendants in this case as requested by the defendants in their requested special charge No. 1, a part of the record herein; the evidence being insufficient to support a judgment in favor of plaintiffs or entitle them to the relief sought and granted by the judgment entered herein."

Proposition No. 1: "Before the court would be authorized to enter judgment reforming the two deeds from plaintiffs to Wilkins it was incumbent upon the plaintiffs to plead and prove by a preponderance of the evidence that the parties actually made a definite and certain agreement other and different from the one evidenced by the deeds in question; that their minds actually met on the terms of an agreement which was not evidenced by either of the deeds."

Proposition No. 2: "Where no fraud is shown, it must affirmatively appear from the pleadings and the proof that both parties to the written deeds must have misunderstood the terms of the instrument; they must have been mutually mistaken as to the terms and effect of the instruments passed."

Proposition No. 3: "Where no fraud or imposition is shown; full opportunity to know or ascertain the terms and effect of instrument solemnly executed; no claim by pleadings or proof that same would not have been executed for the consideration received, even if fully understood, presents no such situation as will be relieved against by a court of equity, which favors only the diligent and those who come with clean hands."

As appellants filed no objections to the questions as submitted to the jury, nor moved to set aside the jury's verdict thereon, and have no assignment here that the answers are against the weight of the evidence, we cannot consider any proposition raising that issue. Taylor v. Davis (Tex. Civ. App.) 234 S. W. 106. This court said, in Railway Co. v. McGown, 239 S. W. 282, citing a number of authorities:

"As appellant did not except to the issues submitted to the jury, requiring them to find the amount of appellee's damages, and as he made no motion to set aside their findings on that issue, and as he did not except to such findings in his motion for new trial, he cannot now inquire into the sufficiency of the evidence to sustain such finding."

[2, 3] But under their request for an instructed verdict appellants can raise the is-

sue that there was no evidence to carry these questions to the jury. Appellees make the following statement of the evidence as against an instructed verdict:

"The nine acres of land described in appellees' petition was at the time of this transaction their homestead, and had been continuously for about 30 years. L. P. Palmer testified that some time before this deed was made the appellant Wilkins asked him if he could get any royalty in the Hull Oil Field, and Palmer told him he thought he could get some royalty off of the Albert Dagle nine acres of land for $750 per acre; Palmer further saying that 'at that time there was nothing said by me or him about buying the fee-simple title, or buying the land outright.' L. P. Palmer then, so he testified, reported to his brother, A. D. Palmer, the conversation he had with Wilkins, and a little later A. D. Palmer informed L. P. Palmer that the Dagles would sell some royalty, and L. P. Palmer says he 'made a report to Mr. Wilkins that he could buy the royalty. * * * I found out he could get royalty. There wasn't anything said about land. * * * I was not representing the Dagles. My brother was representing the Dagles. * * * I was not undertaking to make any trade for Wilkins at that time, nothing more than to hunt him up to see if he could buy the royalty, for him. I did that.'

"A. D. Palmer testified that 'in the year 1919 I was acting as agent for A. R. Dagle and his wife in the sale of royalty interests owned by them. * * * Mr. Dagle had leased his nine acres of land for mineral rights and retained a one-eighth royalty interest in all minerals produced thereon. As Mr. Dagle's agent, I endeavored to sell one-half of his one-eighth royalty interest in the nine-acre tract, and finally succeeded in selling Mr. A. W. Wilkins one-half of the one-eighth royalty interest retained by Mr. Dagle. Selling the land in fee was never mentioned by any of the parties to the transaction—the land was not for sale. The only subject was the sale of a one-half interest in the one-eighth royalty interest retained by Mr. Dagle, or a one-sixteenth interest in the whole nine acres to be purchased by Mr. Wilkins. That is as I understood it. To my knowledge no mention was ever made of selling the land in fee. To my personal knowledge A. D. Wilkins did not endeavor to buy an interest in the land—he was only buying a royalty interest in the oil and mineral rights. * * * A. D. Wilkins was not buying an interest in the land itself in fee simple, but was buying all of the oil, gas, and other minerals as represented by one-half of the one-eighth royalty interest owned by A. R. Dagle in the nine acres.'

"Mrs. Serena Dagle, the wife of A. R. Dagle, testified:

" 'I remember making a deed to some royalty; I don't remember selling any land. We traded with Mr. A. D. Palmer. I never made the trade with Mr. Wilkins. * * * We made the transaction with Mr. Palmer to sell royalty, one-sixteenth royalty on four and one-half acres. At that time the land was leased. We authorized Mr. Palmer to sell royalty for us in the Jesse Devore land where we live. We owned nine acres out of the Jesse Devore. As I understood it, we were going to get $750 an acre for that,' and 'I remember when Mr. Bevers came up to my house to take an acknowledgment of conveyance. I knew at the time what that document related to. It related to the royalty—at that time a one-sixteenth royalty interest. There was a lease on the land at that time, and I had retained in that lease a one-eighth. I was selling to Mr. Wilkins a part of what I retained. My understanding was he would have a one-half interest after the lease expired. That is the way I understood it. * * * On the day Mr. Bevers was to take the acknowledgment he did not read over the document to me nor any part of it. He just said—asked me if I understood what I was signing; I told him I did; we were talking about royalties. I told him, 'Yes, sir, it was royalty sale.' I told him nothing else, just royalty; I told him that was all I was selling. At that time I did not know it called for an undivided one-half of nine acres of land outright. I first found that out about a year afterwards.'

"The habendum clause of the deed dated February 15, 1919, and signed by Mr. and Mrs. Dagle, contained a mistake in that the names of the grantors were written therein where the name of the grantee should have appeared. Shortly after this deed had been delivered to him A. D. Wilkins learned from his attorney of the mistake in the habendum clause, and then he had a second deed prepared for the purpose of correcting such mistake. And Wilkins testified that this second deed he sent to either A. D. Palmer or Lon Palmer, and requested him to have the Dagles execute it. In reference to this deed Mrs. Dagle testified:

" 'Mr. R. W. Franklow brought that paper to me. I think he held the office of justice of the peace. * * * Mr. Franklow did not explain that paper to me. He just said it was some royalty papers, just like I signed before. * * * I had not heard anything about the mistake in the name before Franklow came. * * * Besides telling me there was a mistake in the name, he did not tell me what the papers contained. He did not further explain how the document read. He did not read over any part of it to me. * * * Mr. Franklow was the first one told me there was a mistake in the name of the deed, and it had to be corrected. * * * Besides the information that was needed to correct the mistake, nothing else was said about it one way or the other. The second deed was made for the purpose of correcting a mistake in the name. * * * I never read over this second instrument. I never read any of it over. * * * I didn't think anything about any land. I didn't sell any land. There wasn't anything said about selling any land, I had not agreed to sell this land to Mr. Wilkins before I agreed to sign this document.'

"S. E. Bevers testified that he was a notary public in 1919, and, referring to the deed of date February 15, 1919, said:

" 'I remember this much about taking the acknowledgment to that deed. * * * Archie Wilkins, I think, he talked to me about the trade before the trade was made. * * * I do not know that he told me what he was buying, but he was on some deal for some royalty in the Dagle tract; that is, Mr. Wilkins told me he was on a deal for royalty. * * * A little later, then, I was called on to take an acknowledgment to a document between the Dagles and Wilkins. They handed me a deed to be acknowledged. If I remember right, Mr. Lon Palmer or Mr. A. D. Palmer handed the deed to me as they passed

my office. I really think Mr. Wilkins was in there. Mr. Dagle was in there,' and 'when I went to Mrs. Dagle's house, I did not explain the deed to her. When that document was placed in my hands, and when I went up to Mrs. Dagle's house to take her acknowledgment, I went in and asked Mrs. Dagle this question: "Do you understand this instrument?" I didn't have time—my recollection is I didn't charge them anything for taking the acknowledgment, and I didn't have time to take very much time, unless it was necessary. My recollection is she said she understood what she was signing there, and, of course in their case, her husband not present, I just let her sign, and took the acknowledgment and went ahead. I do not think I read that to her, because I didn't have time. I thought she knew what this trade was, seemed to have been pending some day or two or such a matter.'

"A. R. Dagle testified that in January, 1919, A. D. Palmer told him he had met a man in Sour Lake that wanted some royalty, and 'I told him to go ahead and sell some for me. * * * A. D. Palmer was representing me and my wife. Mr. Wilkins finally came to Hull to take part in the deal, and that was the first time I ever saw him. * * * I told Lon Palmer I was selling royalty in this land, a one-sixteenth royalty, or one-half, as you term it, after the lease was off. It was leased at that time to the Higgins Oil Company. Under that lease I was to get one-eighth. I agreed to sell a one-fourth interest in the royalty. That would amount to one-sixteenth. We were to get $750 an acre. At that time we owned nine acres. After Mr. Wilkins arrived at Hull, I did not talk to him any. They went ahead and drew up the papers, brought them to me, and I signed them. I do not know who had the papers drawn up. I did not have anything to do with that. I didn't see them until they brought them to me and I signed them. I have no education to amount to anything. I can write my own name in box car letters. I can read a very little. I can read my own name when I see it. A. D. Palmer and Mr. Bevers brought me the papers. The paper was not read over to me. I don't know whether Mr. Wilkins was there at the time or not, but I think he was standing around there. I know I signed the business. I asked them if this was a royalty sale and nothing else, and they said yes, because I didn't want to sign a paper that took my land away from me. When I signed that paper, he did not explain to me that it was a deed for one-half interest in the land. Mr. Bevers nor no one else explained to me that that was the nature and effect of the paper. When I signed and acknowledged it before Mr. Bevers, it was my understanding I was signing a royalty paper. I mean by that an interest in the mineral rights. * * * I did not agree with anybody, at any time, before I signed either of these papers, with Mr. Wilkins, Mr. Gordon, or anybody else to sell any interest in this land—not a foot of it, one-half of it, half an acre, nor any other amount.'

"And referring to the second deed which he afterwards signed, A. R. Dagle testified that 'they wanted a name changed * * * and I thought it was a royalty paper. * * * I just went into the house and signed it, nobody read it to me. * * * It was Mr. Franklow who told me they wanted a name changed. * * * He just said there was a name wrong; that is all he said. He told me that it was to change that name. That is all I asked him. I asked him if it was a royalty paper. I told him I wouldn't sign nothing that was selling my land, that I didn't want to sell it, and had never intended to sell it. He told me it was a royalty deed. * * * I did not ask Mr. Franklow to read it. I did not ask my wife to read it to me. * * * I just didn't ask them to read it, that is all I can tell you. I just come in in a hurry from work; they wanted me to sign the paper.' ·

"Dagle had leased parts of the land to different tenants who built houses thereon and paid him a rental for the lots leased. And he testified that it was about a year after he signed the second deed before any of the appellants claimed 'any part of my land and wanted half of the money I was getting from these tenants on the land.' Also he stated that after he made the deeds to Wilkins he continued to pay taxes on the entire nine acres."

Appellants' evidence was contradictory of the evidence offered by appellees, but on this issue we are concerned only with the question whether there was any evidence to carry the case to the jury, and in our judgment the questions submitted were clearly raised, and it would have been reversible error for the court to have instructed in favor of appellants, and, though not required to do so under appellants' assignments and propositions, we would say that the verdict is fully supported by the evidence offered in this case.

[4] Appellants' fourth proposition is as follows:

"Where the pleadings assert a contract actually made different from one sought to be reformed, proof of facts tending to establish a character of contract different from the one pleaded as actually made, as well as one different from the one evidenced by the instruments sought to be reformed, is inadmissible in evidence and prejudicial."

There was evidence raising the issue as pleaded and submitted. Mrs. Dagle testified:

"I remember when Mr. Bevers came up to my house to take an acknowledgment of conveyance. I knew at the time what that document related to. It related to the royalty, at that time a one-sixteenth royalty interest. There was a lease on the land at that time, and I had retained in that lease a one-eighth. I was selling to Mr. Wilkins a part of what I retained. My understanding was he would have a one-half interest after the lease expired. That is the way I understood it."

While much of appellees' testimony, as shown by the statement we have given, was to the effect that they were selling one-half of their one-eighth royalty interest, the intent of the testimony was as expressed in Mrs. Dagle's statement just quoted:

"I was selling to Mr. Wilkins a part of what I retained. My understanding was he would

have a one-half interest after the lease expired. That is the way I understood it."

[5] The fifth proposition is:

"Testimony of a notary public tending to impeach the verity and truthfulness of his official certificate is inadmissible and prejudicial."

In support of this proposition appellants make the following statement:

"The witness Bevers took the acknowledgment of the plaintiffs to the deed, of date February 15, 1919. He was permitted to testify that he did not explain the deed to Mrs. Serena Dagle. This testimony was objected to as shown by said bill, because it was permitting the witness to deny and impeach his own official certificate as a notary."

There was no issue as to the terms of the deed in question. No point was made against its regularity, nor was any effort made to avoid the effect of the instrument on the ground that it was not acknowledged in due form. Appellees were not seeking relief from the covenants of the deeds, but were praying that they be made to express the contract as made, conveying only the property that the parties mutually agreed to convey. They were willing to abide by the acknowledgment of the wife, as shown by the officer's certificate. The proposition, therefore, which appellants invoke has no application to this case. If appellees were seeking to set aside the instrument on the ground that it was not duly acknowledged, and therefore wholly insufficient to convey the homestead, and appellants were shown to be innocent purchasers under the faith of the officer's certificate, we would have an entirely different question. The notary and the wife occupy no different status from other witnesses on the issue of mutual mistake. If, in fact, the deed had been read to Mrs. Dagle and she had commented on and acknowledged its terms, the notary could have so testified, and, if he did not read it to her, he could so testify. Such testimony was not an impeachment of the notarial certificate, because the certificate was not in issue. It might be that the certificate was admissible to impeach the notary's testimony, as would be any other statement made by him contrary to the facts he was testifying to as a witness, but, since parol evidence is always admissible to show that a deed, contract, or other written document has been incorrectly reduced to writing, as the result of a mutual mistake (Kelley v. Ward, 94 Tex. 289, 60 S. W. 311; Syler v. Culp [Tex. Civ. App.] 138 S. W. 175; Avery v. Hunton, 23 Tex. Civ. App. 353, 56 S. W. 211; Silliman v. Taylor, 35 Tex. Civ. App. 490, 80 S. W. 651; Harry v. Hamilton [Tex. Civ. App.] 154 S. W. 637; Galloway v. Kerr [Tex. Civ. App.] 63 S. W. 180; Western Ass'n Co. v. Hillyer [Tex. Civ. App.] 167 S. W. 821), we know of no principle that would prevent a notary from testifying to that fact, simply because he may have made a prior statement, no matter how formal or contradictory of his offered evidence, unless, as already said, innocent parties have acquired rights on the faith of his formal act.

[6] Under their sixth proposition appellants say:

"In the trial of a case, even when submitted on special issues, it is the duty of the court to define and explain the meaning of legal and technical terms when same must of necessity be taken into consideration in passing upon the facts in evidence."

[7, 8] We do not see that the giving of such a charge could have been of any material assistance to the jury on the facts of this case. It is clear that no technical distinctions were involved in the use of the terms "a fee-simple estate" and "a royalty interest." The testimony made clear the difference between the contract pleaded and the one evidenced by the deeds. The witnesses made this distinction clear in their evidence, and the jury must have understood it. But, anyway, we cannot say that the refusal was such a denial of the rights of appellants as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. Under rule 62a of the Courts of Civil Appeals, the refusal of this charge is not reversible error. Railway Co. v. Bosher (Tex. Civ. App.) 165 S. W. 96; Englefield v. Railway Co. (Tex. Civ. App.) 159 S. W. 1033; Solan v. Pasche (Tex. Civ. App.) 153 S. W. 672. On the ground that they were entitled to a charge instructing the jury "as to the effect of the presumption raised by the execution and delivery of the deeds sought to be reformed," appellants requested the following charge, which was refused:

"Gentlemen of the jury, the effect of the two deeds introduced in evidence from Dagle and wife to Wilkins was to convey an undivided four and one-half acres, or one-half of the land described in plaintiffs' petition and purported to convey a fee-simple title or estate to such interest. The execution and delivery of such deed raises a presumption that the parties intended that such deeds should have such effect and you will so find, unless the evidence is sufficient to overcome such presumption as well as any other contradictory evidence. The burden of proof by a preponderance of the testimony is upon the plaintiffs to establish the facts that the intention of the parties, as presumptively evidenced by the deeds offered as you have been above instructed, was other and different from that established by such deeds."

[9] We think this charge was on the weight of the evidence, and not within the rule announced in Howard v. Zimpelman (Tex. Sup.) 14 S. W. 59, and Carl v. Settegast (Tex. Com. App.) 237 S. W. 241; (Tex. Civ. App.) 211 S. W. 506, and the cases reviewed therein. In those cases an effort was being made

to change the legal effect of the conveyances and to ingraft a trust upon what purported to be deeds of conveyance or to show that they were intended as mortgages. Here no such issue was raised. This was only a question of mutual mistake. The effect of the deeds as conveyances was admitted. Only the subject of the conveyance—what was, in fact, conveyed—was before the court. We do not understand that the same rule applies as between these two issues. But, if we are incorrect in this, and if the charge was not upon the weight of the evidence, then it is controlled by rule 62a, on the ground that, while it may not be error to give such charges as requested by appellants, the authorities do not hold that it is reversible error in all cases to refuse them.

[10] Appellants' ninth and tenth assignments of error and the proposition thereunder are as follows:

Ninth assignment: "The court erred in refusing and failing to submit to the jury defendants' requested question No. 5, a part of the record herein, for that said question submitted to the jury the question of diligence on the part of A. R. Dagle and wife, Serena Dagle, in ascertaining that the deeds from them to Wilkins conveyed a title to the property before the execution and delivery thereof, and was a proper and essential question to be submitted to the jury under the facts of this case, all of which more fully appears from defendants' bill of exceptions No. 5, a part of the record herein."

Tenth Assignment: "The court erred in failing and refusing to submit to the jury defendants' requested question No. 6, for that same raised the question of diligence of the Dagles in ascertaining the contents of the deed from them to Wilkins of date March —, 1919, and was proper and an essential question to be proponded to the jury from the defendants' standpoint under the facts and issues in this case, all of which more fully appears from defendants' bill of exceptions No. 6, a part of the record herein."

Proposition: "All material issues of fact should be submitted to the jury for affirmative findings."

These assignments are based on the refusal of the following requested issues:

"Could A. R. Dagle, or his wife, Mrs. Serena Dagle, by the use of reasonable diligence, have ascertained that either of the deeds from them to Wilkins conveyed a fee-simple title in and to an undivided interest of four and one-half acres in the nine-acre tract described in plaintiffs' petition?"

"At the time of the execution and delivery of the deed from the Dagles to Wilkins of March —, 1919, introduced in evidence, could A. R. Dagle and Mrs. Serena Dagle, by the use of reasonable diligence, have known that same conveyed to Wilkins an undivided interest of four and one-half acres if fee simple to the defendant A. D. Wilkins?"

These issues were properly refused, because the jury's answers thereto would not have been determinative of any issue in the case. In order to be relieved from the effect of a mutual mistake in a deed or any other written contract or agreement it is not necessary for the party complaining against the mistake to show that he exercised diligence to determine what the instrument as drawn up contained at the time it was executed by him. Kelley v. Ward, 94 Tex. 296, 60 S. W. 311; Harry v. Hamilton (Tex. Civ. App.) 154 S. W. 637; Littlefield v. Clayton (Tex. Civ. App.) 194 S. W. 197; Edwards v. Railway Co., 54 Tex. Civ. App. 334, 118 S. W. 576; Bank v. Railway Co. (Tex. Civ. App.) 225 S. W. 397.

In Kelley v. Ward, supra, the Supreme Court said:

"Against a mistake of both parties, by which, in the effort to reduce the agreement which they had made to writing, they mistake its terms so that the writing does not represent the real contract, equity will grant relief."

In Edwards v. Railway Co., supra, it was said:

"As a second requisite, it has sometimes been said in very general terms that a mistake resulting from the complaining party's own negligence will never be relieved. This proposition is not sustained by the authorities. It would be more accurate to say that where the mistake is wholly caused by the want of that care and diligence in the transaction which should be used by every person of reasonable prudence, and the absence of which would be violation of legal duty, a court of equity will not interpose its relief; but even this more guarded mode of statement, each instance of negligence must depend to a great extent upon its own circumstances. It is not every negligence that will stay the hand of the court. The conclusion from the best authorities seems to be that the neglect must amount to the violation of a positive legal duty. The highest possible care is not demanded. Even a clearly established negligence may not of itself be a sufficient ground for refusing relief, if it appears that the other party has not been prejudiced thereby. In addition to the two foregoing requisites it has been said that equity would never give any relief from a mistake, if the party could by reasonable diligence have ascertained the real facts; nor where the means of information are open to both parties and no confidence is reposed; nor unless the other party was under some obligation to disclose the facts known to himself, and concealed them. A moment's reflection will clearly show that these rules cannot possibly apply to all instances of mistake, and furnish the prerequisites for all species of relief. Their operation is, indeed, quite narrow. It is confined to the single relief of cancellation, and even then it is restricted to certain special kinds of agreements."

In Harry v. Hamilton, supra, this was stated:

"That John Hamilton and Mrs. Hamilton did not read the deed or understand it does not seriously affect the question."

The court in Littlefield v. Clayton, supra, said:

"In this connection we will consider appellants' twelfth assignment, which complains of the failure of the court to submit the issue of negligence on the part of the plaintiffs, with reference to the failure to have the provision for the unbranded calves of 1914 included in the contract. The evidence shows that the contract was drawn after protracted negotiations, extending over a period of several days; that the plaintiffs and the defendants were together before the scrivener when the contract was being dictated. It was dictated by the defendant White principally, though the others made suggestions from time to time. If the mistake was mutual, we do not think that negligence or inattention on the part of the plaintiffs under the circumstances would preclude them from asking for relief on account of the mistake."

In Bank v. Railway Co., supra, the same rule was announced:

"As to the negligence of the parties, it would seem that the bank's agent, Peters, was equally at fault with the shipping clerk, Jarvis. The term 'mistake' carries with it the idea of fault, but the mere fact that a mistake was made in an instrument does not show such negligence as to bar the right of reformation, for, if that were so, a court of equity could never interfere."

Finding no errors in this record, the judgment of the trial court is in all things affirmed.